**Niles R. LEEPER, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 81–0530.**

United States District Court, M.D. Pennsylvania.

Dec. 15, 1983.

Stanley M. Shingles, Philadelphia, Pa., for plaintiffs.

Frederick E. Martin, Asst. U.S. Atty., Lewisburg, Pa., for defendants.

MEMORANDUM

CALDWELL, District Judge.

## I. INTRODUCTION

The plaintiff, Niles R. Leeper, was injected with swine flu vaccine on December 8, 1976. He contracted Guillain-Barre syndrome and was hospitalized from December 27, 1976 to March 12, 1977. Plaintiff brought suit against the United States of America and, on September 22, 1983, the United States entered into a stipulation with the plaintiff wherein it accepted liability. Trial on damages was conducted on September 29, and November 1, 1983. Our task is now to determine, from the testimony presented, what amount of money will fairly compensate the plaintiff for the injury he has suffered.

## II. FACTUAL BACKGROUND

The course of plaintiff's illness can be characterized as a period of physical and psychological devastation followed by a most remarkable recovery. Following the plaintiff's admission to Geisinger Medical Center on December 27, 1976, the disease progressed over the course of a week until the plaintiff was totally paralyzed. Dr. Cohn, plaintiff's neurologist, testified that the paralysis stopped just short of involving the respiratory muscles to the extent that a respirator would be required. There was concern, however, that the disease would progress to the extent that Mr. Leeper would be unable to breathe for himself, and Dr. Cohn testified that this concern was related to him. Both Dr. Cohn and the plaintiff testified that he was in extreme pain during this period as well as extreme anxiety. Dr. Cohn expressed the plaintiff's understandable anxiety very graphically when he stated that "Every time he closed his eyes, he thought he was going to die. (N.T. 20). Plaintiff, his daughters, and his wife all testified movingly to his extreme helplessness, apprehension and, to some extent, embarrassment, during his period of hospitalization. Dr. Cohn prescribed thorazine for the plaintiff's anxiety which the doctor termed as "out of control" as of January 13, 1977 (N.T. 19), and Mr. Leeper was not taken completely off thorazine until May 25, 1977 (N.T. 36). Physically, plaintiff's condition had at least stabilized as of the first week of January, albeit at a very low ebb. By January 11, 1977, plaintiff was removed from the intensive care unit and transferred to the rehabilitation unit. By February 16, 1977 there was a slow return of function to the muscle groups, and by March 9, 1977, plaintiff was able to walk with the aid of a walker. He was discharged from the hospital on March 12, 1977.

Happily, plaintiff is a remarkable man, and he has made a remarkable recovery. The slow but steady course of his progress was reflected in Mrs. Leeper's testimony at trial, as well as in her diary, which was admitted. Mrs. Leeper's diary, which covers March 12, 1977—April 20, 1977, attests to continued pain in Mr. Leeper's legs and feet throughout that period as well as tiredness. The diary does, however, evidence a determined return to activity on plaintiff's part. For example, an entry dated April 13, 1977, indicates that the plaintiff, an accomplished pianist, was again practicing the piano with his friends. Dr. Cohn was increasingly pleased with plaintiff's progress at visits on April 20, 1977, May 25, 1977, and August, 1977. On August 11, 1977 plaintiff was readmitted to Geisinger for a transurethra resection of the prostate which, his urologist Dr. Rose testified, was necessitated by the Guillain-Barre Syndrome.

Plaintiff returned to work on September 19, 1977. He has enjoyed a more or less complete recovery. He does suffer residual pain and tingling in his feet as well as restless leg syndrome which may be permanent. There was also considerable testimony as to a loss of stamina manifested in more frequent naps, and in some reduction in plaintiff's activities in community affairs and loss of interest in Leeper's Music House, a music store which had been operated principally by Mrs. Leeper.

## III. SPECIFIC CLAIMS FOR DAMAGES

With this general factual background, we analyze plaintiff's separate claim for damages as described in the post trial briefs submitted by the parties.

## A. Medical Expenses

There is apparently no dispute that the medical expenses are fully reimbursable as claimed by the plaintiff, and we will therefore award the sum of $18,870.84 for medical expenses.

## B. Lost Earnings and Lost Earning Capacity

Plaintiff has claimed entitlement to damages for past lost earnings, future loss of earnings and lost earning capacity, earnings loss resulting for early retirement, loss of pension benefits, and loss of self-employment income. Naturally, the appropriateness of much of the damages claimed in this category hinges on the effect of the Guillain-Barre Syndrome on plaintiff's ability to continue his job as postmaster of Burnham, Pennsylvania and to continue to assist in maintaining Leeper Music House, the family business. As we have previously described, the residual effects of the plaintiff's illness principally involve a tingling sensation in his feet which has remained undiminished in the six years since he returned to work and which occasionally progresses to his legs, arms and torso. There was also testimony that plaintiff has suffered from a loss of stamina which is manifested in reduced extra-employment activities and in lunch-hour naps. There was no testimony presented to suggest that plaintiff is disabled or that he cannot satisfactorily perform his duties as postmaster. Indeed, that his performance has been exemplary is reflected in his Postal Service evaluation forms (defendant's exhibits 7.1–7.3) which reflect good or outstanding ratings from 1980–1982.

■ Nevertheless, plaintiff has expressed his intention to retire in September, 1984 at age 55. This projected retirement would occur two years before plaintiff would be entitled to maximum pension benefits. At trial plaintiff was an admirably candid and forthright witness who did not exaggerate or overstate his complaints. From his testimony, we gather that while plaintiff does indeed suffer residual discomfort as a result of his illness, his decision to elect early retirement is rather a result of a "reordering of priorities" which occurred since the illness. Since his illness, plaintiff has become more aware of his own mortality and the vagaries of life. Accordingly, he has, elected an early retirement, in his words, "to enjoy life" and "to smell the roses." We cannot fault plaintiff's decision. Good or bad, however, the heightened sense of mortality of which plaintiff complains is an integral part of the human condition and is the inevitable result of the process of living and aging. We must find, therefore, that his decision was made as a result of free choice and philosophical reflection and that it was not inevitably caused by his bout with Guillain-Barre Syndrome. Because we find that plaintiff's illness was not a significant factor in his decision to elect early retirement, we will not award damages for loss of future earnings or diminution of pension benefits as a result of early retirement.[1]

■ We now address plaintiff's claim for loss of self-employment income as the result of the closing of Leeper Music House. The Leeper Music House was a family business formerly operated by plaintiff and his wife. Again, it appears that the decision to close the store was a voluntary one on the part of the Leepers. The store has been operated successfully, principally by Mrs. Leeper, in the six years following Mr. Leeper's illness. It appears that, since Mr. Leeper has always worked at the post office, Mrs. Leeper has always been primarily responsible for the store's operation. Even after his illness, Mr. Leeper would spend a lessened amount of time at the store, and was available to give piano demonstrations when necessary. Assuming his retirement from the postal service in 1984, Mr. Leeper would have been able to devote even more time to the operation of the store. Mrs. Leeper did testify that, since his illness, plaintiff demonstrated a lack of interest in the store, and that this affected the decision to close. The evidence reflects

---

1. As defendant points out, an award of damages here would also violate the legal rule which requires a plaintiff to mitigate damages insofar as is possible. *See Vizzini v. Ford Motor Co.,* 569 F.2d 754 (3d Cir.1977).

that the store could still have been operated profitably by Mrs. Leeper, despite her husband's lack of interest, had she chosen to do so. We will therefore not award damages for future loss of self-employment income.

■ Plaintiff also seeks lost profits from the Leeper Music House for 1977, the year in which he was ill. Damages sought are $4,045.55 or the difference between the average net profits of 1974 and 1975, the two full years preceding the year in which plaintiff was stricken ($6,925.85) and the net profits for 1977 ($2,880.30). We understand that there are various technical objections to the method of calculation and to plaintiff's entitlement to the entire amount. We believe, however, that the weight of the credible evidence suggests that the plaintiff is entitled to some compensation for loss of self-employment income for the year in which he was actually disabled. The amount suggested seems reasonably fair and accurate, and we will, therefore award the sum of $4,045.55 for loss of part self-employment income.

■ Naturally, plaintiff is entitled to compensation for loss of earnings during the period of his disability and absence from work December 27, 1976 to September 18, 1977. Plaintiff contends he is entitled to $13,155.64, the amount of wages he would have earned during this period. The record reflects, however, that plaintiff was paid wages during his period of absence by utilization of his accumulated sick leave. The use of this sick leave, however, diminished the pension to which plaintiff will be entitled upon his retirement next year by $7,988.86. We conclude that this sum reflects most appropriately the income lost by virtue of plaintiff's illness and it is this sum which we will award.

## C. Pain and Suffering

■ Plaintiff is of course entitled to a substantial award for pain and suffering. In his brief, plaintiff has categorized various varieties of pain and suffering including past and future physical pain and suffering, loss of the feeling of well-being, emotional upset, and worry, anxiety and apprehension. We have previously discussed the cause of plaintiff's illness and

recovery in general fashion and we will not restate it. Nor will we compartmentalize our findings into the separate categories suggested or make separate awards. As our previous comments suggest, we are prepared to accept that, from December 27, 1976 through some period in January, 1977, plaintiff experienced extremely intense physical, mental and emotional agony and that he experienced substantial physical and mental pain and suffering, to a lesser degree, through his release in March, 1977. We recognize that a slow period of rehabilitation followed which is also compensable. In August, 1977, plaintiff suffered additional pain and suffering as a result of a prostate operation necessitated by the Guillain-Barre Syndrome. Following his return to work, and continuing to the present, we find that plaintiff suffers relatively minor physical discomfort and loss of stamina which may continue for the rest of his life. There has been some testimony that plaintiff exhibits a more melancholy temperament than before his illness, and that he is concerned that the syndrome may recur.

It is almost inevitable in assessing the measure of damages in such a case, to conclude that no amount of money can fairly compensate the plaintiff for the distress he has endured. That is, no sane person would argue that any sum would make the suffering worthwhile or truly soothe the memory of it. We can never, in this sense, hope to make plaintiff whole by any award of money. Recognizing the inherent inadequacy of money damages, it is nevertheless incumbent upon us to select a figure which we feel is reasonable under all the circumstances. Plaintiff's period of greatest suffering was, mercifully, finite and in fact of relatively short duration and was followed by a moderate period of convalescence and, finally, by substantial recovery. We will award the plaintiff the sum of $75,000.00 for past physical and mental pain and suffering.

■ As we have stated before, plaintiff's recovery is most remarkable. Had the plaintiff been an individual of less drive and determination, his recovery may have been significantly more protracted and, indeed, less complete. We believe that the plaintiff must be awarded damages for the

residual discomfort he still feels and may feel for the rest of his life. While we hesitate to classify the plaintiff's continuing complaints as minor, the testimony does not indicate that they significantly impair the conduct and enjoyment of his life. There has been some testimony as to plaintiff's anxiety over his condition and the fear that the Guillain-Barre Syndrome may recur. Based on the testimony presented, we feel that plaintiff may be experiencing some anxiety over his condition and the memory of his illness. Medical testimony, however, was to the effect that the chances of a recurrence are extremely remote, and we therefore feel that a substantial award for future emotional and psychological pain and suffering is not in order. Under all the circumstances, we will award the sum of $10,000 for future physical and mental pain and suffering.

## IV. SUMMARY OF AWARD

We recapitulate our awards:

| | |
|---|---|
| Medical Expenses | $18,870.84 |
| Diminution of Pension/Lost Sick Leave | $ 7,988.86 |
| Loss of Past Self-Employment Income | $4,045.55 |
| Pain and Suffering | $85,000.00 |
| Total | $115,905.25 |